UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
| ) | Criminal No. 4:21-CR-143 |
| v.     ) | |
| ) | PLEA AGREEMENT |
| MICHAEL BARRY SLATER,    ) | |
| ) | |
| Defendant.    ) | |

The United States of America (also referred to as "the Government") and the Defendant,
MICHAEL BARRY SLATER, and Defendant's attorney, enter into this Plea Agreement.

## A.   CHARGES

1.   <u>Subject Offense</u>.   Defendant will waive Indictment (by executing a separate
waiver of Indictment form) and plead guilty to Count 1 of a United States Attorney's Information,
that is, Conspiracy to Commit Wire Fraud Affecting a Financial Institution, in violation of Title
18, United States Code, Section 1349.

2.   <u>No Charges to be Dismissed</u>.   There are no charges to be dismissed.

## B.   MAXIMUM PENALTIES

3.   <u>Maximum Punishment</u>.   Defendant understands that the crime to which Defendant
is pleading guilty carries a maximum sentence of 30 years in prison; a maximum fine of
$1,000,000, or twice the gain or loss, whichever is greater; and a term of supervised release of up
to 5 years.   A mandatory special assessment of $100 per count also must be imposed by the Court.

4.   <u>Supervised Release--Explained</u>.   Defendant understands that, during any period of
supervised release or probation, Defendant will be under supervision and will be required to
comply with certain conditions.   If Defendant were to violate a condition of supervised release,
Defendant could be sentenced to not more than three (3) years in prison, without any credit for

time previously served.

5.   <u>Detention</u>.   Provided that Defendant does not violate any conditions of Defendant's pretrial release, and does not appear to be mentally at risk to harm himself or any other person, the Government agrees to recommend that Defendant may remain on pretrial release pending imposition of sentence.

**C.   NATURE OF THE OFFENSE -- FACTUAL BASIS**

6.   <u>Elements Understood</u>.   Defendant understands that to prove the offense alleged in the Information **(Conspiracy to Commit Wire Fraud Affecting a Financial Institution)**, the Government would be required to prove beyond a reasonable doubt the following elements:

    a.   On or before September 2011, two or more people reached an agreement to commit the crime of wire fraud affecting a financial institution;

    b.   Defendant willfully and knowingly joined in the agreement, either at the time it was first reached or at some later time while it was still in effect; and

    c.   At the time Defendant joined in the agreement, Defendant knew the purpose of the agreement.

The crime of wire fraud affecting a financial institution has the following elements:

    a.   Defendant voluntarily and intentionally devised or participated in a scheme to defraud another out of money, or obtain money by means of materially false and fraudulent pretenses, representations or promises, or by intentional concealment of material facts, which scheme is described in the Information;

    b.   Defendant acted with the intent to defraud;

    c.   Defendant or another participant in the scheme to defraud used, or caused to be used, an interstate wire communication in furtherance of, or in an attempt to carry out, some essential step in the scheme; and

    d.   The fraud scheme affected a financial institution.

2

7.    <u>Factual Basis</u>.   As a factual basis for his plea of guilty, Defendant admits the following:

a.    Valley Bank in Moline, Illinois, was a financial institution as defined under 18 U.S.C. § 20 and 18 U.S.C. § 3293(2), the accounts of which were insured by the Federal Deposit Insurance Corporation.

b.    Vital Financial Services ("Vital") was a lending service provider ("LSP") based in Clive, Iowa, within the Southern District of Iowa.   As an LSP, Vital packaged, originated, disbursed, serviced, and liquidated loans guaranteed by the Small Business Administration ("SBA") on behalf of their lending institution clients.   Vital assisted banks in obtaining SBA loan guarantees as part of the loan origination process.   Valley Bank retained Vital to assist in originating SBA loans, including loans for Borrower #1.

c.    SLATER was the founder and president of Vital.

d.    LARRY HENSON the President and Chairman of Valley Bank in Moline, Illinois.   Valley Bank was wholly-owned by River Valley Bancorp, Inc., a multi-bank holding company, regulated by the Board of Governors of the Federal Reserve System.   HENSON served as the President, Chief Executive Officer, and Chairman of River Valley Bancorp, Inc.

e.    ANDREW ERPELDING was a Vice-President and Regional Manager at Valley Bank.

f.    SUSAN MCLAUGHLIN was the Vice President for Credit Administration at Valley Bank.

g.    Individual #1 was the applicant for the loan in the name of Borrower #2.

h.    Individual #2 was the applicant for the loan in the name of the acronym for Borrower #2.

**Loan to Borrower #1:**

i.    On October 17, 2011, Defendant SLATER and his conspirators submitted an application for a $5,000,000 guaranteed loan to the U.S. Small Business Administration ("SBA") concerning Borrower #1.   The loan application was submitted through the SBA's 7(a) loan program and underwent processing at the SBA's loan guaranty processing center.   Accurate loan history and borrower information are material to SBA's evaluation of whether to approve a loan application.

j.      ERPELDING received a phone call from SLATER who told him that the Borrower #1 loan could not be made because of past due payment histories associated with the loans to be refinanced.  SLATER stated that loans that had payment delinquency that are more than 30 days past due could not be refinanced with an SBA-guaranteed loan.  ERPELDING called HENSON with the information provided by SLATER.  ERPELDING called MCLAUGHLIN on a three-way call with HENSON.  HENSON and ERPELDING explained to MCLAUGHLIN that the past-due payments on the Borrower #1 loan were an issue and that MCLAUGHLIN was to alter the reports to erase any indication that the loans had ever been past due.

k.      MCLAUGHLIN logged in to Valley Bank's system and fraudulently changed Borrower #1's loan history to remove payment delinquencies. ERPELDING later pulled the loan transcripts in question and the payment histories falsely reflected that the loans had never been more than 29 days past due.  ERPELDING reprinted the loan transcripts, signed them, and forwarded them to SLATER.  SLATER then submitted the falsified payment histories to the SBA.  SLATER personally directed ERPELDING on what was to be written on the loan transcripts in question in order to satisfy SBA's requirements.  SLATER emailed the transcripts to the SBA as part of the loan submission on approximately October 17, 2011.  The SBA ultimately declined the loan on or about November 4, 2011.

**Loan to Borrower #2:**

l.      On September 1, 2011, a loan in the full name of Borrower #2 was initially submitted to the SBA loan guaranty program.  An employee of Vital emailed the loan package on approximately September 1, 2011 to the SBA 7(a) loan program email account.  The Vital employee copied SLATER on the email submission to the SBA.  According to the loan documents, Borrower #2 was a new business started in the third quarter of 2010 and was located in Homestead, Florida.  Borrower #2 was noted as a wholesale provider of container trees, plants, and palms.  The owner, which was reported as Individual #1 (100% owner), purchased the inventory of a failed grower and he requested an SBA guaranteed loan in the amount of $4,630,000, which comprised $2,999,125 in loan proceeds to purchase inventory, $130,000 for working capital, and $1,500,875 to refinance same institution debt (Valley Bank loans).  Specifically, the loans to be refinanced had amounts of $600,000; $250,875; $250,000; and $400,000. The loan application requested that the SBA guarantee 75% of the loan amount.

m.      On approximately September 13, 2011, an SBA Loan Specialist informed ERPELDING and SLATER the loan to Borrower #2 was declined by the

4

SBA due to borrower Individual #1 being a guarantor on two other SBA loans that were in default in the amount of $484,904.03. SLATER emailed the SBA Loan Specialist on approximately September 23, 2011 and notified her that Borrower #2 wished to withdraw their application.

n.   On October 6, 2011, HENSON and ERPELDING caused SLATER to submit a new loan application to the SBA for a business that was an acronym for Borrower #2, when in fact Borrower #2 never operated under that name. The loan application, also known as SBA Form 4, dated September 27, 2011, showed that Individual #2 was the 100% owner of the business. The address for the business was listed as Bunnell, Florida. As part of her loan request, Individual #2 requested $2,999,125 to purchase inventory, $130,000 in working capital (business operating funds), and $1,500,875 to refinance same institution debt (Valley Bank loans), which all totaled $4,630,000. The requested debt refinance showed four Valley Bank loans in the name of the acronym for Borrower #2 and included the same amounts as the initial request for Borrower #2, which were $600,000; $250,875; $250,000; and $400,000. All four loans were reflected as current on the loan application.

o.   Individual #1 was the spouse of Individual #2 and the loan amounts for Borrower #2 and the acronym for Borrower #2 were identical. SLATER knew the new application falsely stated the name of the company and fraudulently omitted the other owner.

p.   The loan application for the acronym for Borrower #2 failed to report the Borrower #2 loans under the section for current and previous SBA and other government debt. The section asks the applicant to report if you, your business, any principal of your business, any affiliate of your business, any other business currently owned by a principal, or any business previously owned by you or a principal of your business has received or applied for any direct or guaranteed financial assistance from the Federal Government, including student loans and disaster loans, and the acronym for Borrower #2 application failed to list the previous loans to Individual #1. The application was signed in the name of Individual #2 and was dated September 27, 2011.

q.   The loan application was accepted by the SBA and ultimately defaulted. The SBA realized a loss of approximately $2,102,150.19 from its guaranty of this loan.

**Loan to Borrower #3:**

r.   Beginning in or about January 2012, Valley Bank attempted to shift the risk of loss on a preexisting loan to Borrower #3 to the SBA by attempting to refinance the loan

5

through the SBA's 7(a) loan program. As part of the application, Borrower #3 requested $1,309,574 in working capital, $3,684,926 to payoff bank loans, and $5,500 for closing costs.

s.  On approximately January 11, 2012, ERPELDING forwarded a Personal Financial Statement reviewed by Borrower #3 to SLATER. The Personal Financial Statement showed that Borrower #3 had a net worth of $407,973.

t.  On approximately January 30, 2012, SLATER submitted the Borrower #3 application to the SBA. In support of the loan, SLATER submitted a Personal Financial Statement that falsely showed that Borrower #3 had a net worth of $2,223,939. The version submitted to the SBA fraudulently indicated that Borrower 3 had $750,000 in savings accounts and that he had other assets in the amount of $1,000,000.

u.  The SBA ultimately approved the loan to Borrower #3 in the amount of $5,000,000, with a loan condition that at least $750,000 cash be injected into the business as equity capital. The SBA authorization noted that the lender must obtain evidence of the injection prior to disbursement.

v.  When interviewed by law enforcement Borrower #3 confirmed that the Personal Financial Statement showing he had a net worth of $407,973 was accurate and that he did not provide a $750,000 cash injection as indicated on forms submitted by SLATER to the SBA.

w.  The SBA loan to Borrower #3 ultimately defaulted and SBA realized a loss of approximately $2,426,041.07 from its guaranty of the loan.

x.  Defendant's conduct included, but was not necessarily limited to, the following:

   i.     Beginning in or about September 2011, and continuing until in or about November 2014, in the Southern District of Iowa, and elsewhere, Defendant SLATER conspired and agreed with HENSON, ERPELDING, MCLAUGHLIN, and others to commit the offense of wire fraud affecting a financial institution, that is, having devised a scheme and artifice to defraud as described above, and for the purpose of executing such scheme and artifice did cause an interstate wire communication, that is, the electronic submission to the SBA of loan applications containing misrepresentations, and which scheme did affect a financial institution, namely, Valley Bank.

8.    Truthfulness of Factual Basis.  Defendant acknowledges that the above statements are true. Defendant understands that, during the change of plea hearing, the judge and the

prosecutor may ask Defendant questions under oath about the offense to which Defendant is pleading guilty, in the presence of Defendant's attorney. Defendant understands that Defendant must answer these questions truthfully, and that Defendant can be prosecuted for perjury if Defendant gives any false answers.

9. <u>Waiver of Rule 410 Rights</u>. Defendant expressly waives Defendant's rights under Rule 410 of the Federal Rules of Evidence and agrees that all factual statements made in this plea agreement, including under the Factual Basis, are admissible against Defendant. Should Defendant fail to plead guilty pursuant to this plea agreement or move to withdraw his plea or to set aside Defendant's conviction, then these admissions may be used against Defendant in the Government's case-in-chief and otherwise, including during the continuing prosecution of this case.

10. <u>Venue</u>. Defendant agrees that venue for this case is proper for the United States District Court for the Southern District of Iowa.

**D.    SENTENCING**

11. <u>Sentencing Guidelines</u>. Defendant understands that Defendant's sentence will be determined by the Court after considering the advisory United States Sentencing Guidelines, together with other factors set forth by law. The Sentencing Guidelines establish a sentencing range based upon factors determined to be present in the case, which include, but are not limited to the following:

      (a)    The nature of the offenses to which Defendant is pleading guilty;

      (b)    The amount of loss, under USSG § 2B1.1(b)(1), with the parties stipulating as a recommendation to the District Court that the loss was between $3,500,000 and $9,500,000.

      (c)    Whether sophisticated means were used to commit all or part of the offense;

(d)     Whether the Defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, under USSG § 3B1.3;

(e)     Defendant's role in the offense under USSG §3B1.1, with the parties stipulating as a recommendation to the District Court that this two-level increase be applied because the defendant served as an organizer, leader, manager, or supervisor of the conspiracy;

(f)     Whether Defendant attempted to obstruct justice in the investigation or prosecution of the offense;

(g)     The nature and extent of Defendant's criminal history (prior convictions); and

(h)     Acceptance or lack of acceptance of responsibility.

Defendant understands that, under some circumstances, the Court may "depart" or "vary" from the Sentencing Guidelines and impose a sentence more severe or less severe than provided by the Sentencing Guidelines, up to the maximum in the statute of conviction.   Defendant has discussed the Sentencing Guidelines with Defendant's attorney.

12.     <u>Acceptance of Responsibility</u>.   The Government agrees to recommend that Defendant receive credit for acceptance of responsibility under USSG §3E1.1.   The Government reserves the right to oppose a reduction under §3E1.1 if after the plea proceeding Defendant obstructs justice, fails to cooperate fully and truthfully with the United States Probation Office, attempts to withdraw Defendant's plea, or otherwise engages in conduct not consistent with acceptance of responsibility.   If the base offense level is 16 or above, as determined by the Court, the Government agrees that Defendant should receive a 3-level reduction, based on timely notification to the Government of Defendant's intent to plead guilty.

13.     <u>Presentence Report</u>.   Defendant understands that the Court may defer a decision as to whether to accept this Plea Agreement until after a Presentence Report has been prepared by the

United States Probation Office, and after Defendant's attorney and the Government have had an opportunity to review and challenge the Presentence Report. The parties are free to provide all relevant information to the Probation Office for use in preparing a Presentence Report.

14.   Disclosure of Presentence Investigation Reports. The United States District Court for the Southern District of Iowa has issued the following Administrative Order:

> The presentence investigation report is a sealed and confidential document. Unless specifically authorized by the district court, a defendant may not disseminate, disclose, or distribute a presentence investigation report, or any part or page of a presentence investigation report, in either draft or final form. A defendant who violates this order, may be subject to prosecution for contempt of court under 18 U.S.C. § 401(3). This order does not apply to a defendant's review of a presentence investigation report with the defendant's own attorney.

Defendant acknowledges and understands this order.

15.   Evidence at Sentencing. The parties may make whatever comment and evidentiary offer they deem appropriate at the time of sentencing and entry of plea, provided that such offer or comment does not violate any other provision of this Plea Agreement. Nothing in this Plea Agreement restricts the right of Defendant or any victim to make an allocution statement, to the extent permitted under the Federal Rules of Criminal Procedure, nor does this Plea Agreement convey any rights to appear at proceedings or make statements that do not otherwise exist.

16.   Sentence to be Decided by Judge -- No Promises. This Plea Agreement is entered pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure. Defendant understands that the final sentence, including the application of the Sentencing Guidelines and any upward or downward departures, is within the sole discretion of the sentencing judge, and that the sentencing judge is not required to accept any factual or legal stipulations agreed to by the parties. Any estimate of the possible sentence to be imposed, by a defense attorney or the Government, is only

a prediction, and not a promise, and is not binding.   Therefore, it is uncertain at this time what Defendant's actual sentence will be. Each party is free to recommend to the sentencing judge whatever sentence it deems appropriate.

17.   No Right to Withdraw Plea.   Defendant understands that Defendant will have no right to withdraw Defendant's plea if the sentence imposed, or the application of the Sentencing Guidelines, is other than what Defendant anticipated, or if the sentencing judge declines to follow the parties' recommendations.

**E.    FINES, COSTS, AND RESTITUTION**

18.   Fines and Costs.   Issues relating to fines and/or costs of incarceration are not dealt with in this agreement, and the parties are free to espouse their respective positions at sentencing.

19.   Special Assessment.   Defendant agrees to pay the mandatory special assessment of $100 ($100 per count) at or before the time of sentencing, as required by 18 U.S.C. § 3013.

20.   Restitution.   The Defendant agrees that the Court should impose an order of restitution for all relevant conduct in an amount to be determined by the Court; that such order of restitution shall be due and payable immediately; and that if Defendant is not able to make full payment immediately, Defendant shall cooperate with the United States Probation Office in establishing an appropriate payment plan, which shall be subject to the approval of the Court, and thereafter in making the required payments.   Any such payment plan does not preclude the Government from utilizing any collections procedures pursuant to the Federal Debt Collections Act and including the Treasury offset program.

21.   Financial Statement.   Defendant agrees to complete truthfully and in full a financial statement provided by the U.S. Attorney's Office, and return the financial statement to the U.S. Attorney's Office within 30 days of the filing of this Plea Agreement.

**F.      LIMITED SCOPE OF AGREEMENT**

22.    <u>Limited Scope of Agreement</u>.   This Plea Agreement does not limit, in any way, the right or ability of the Government to investigate or prosecute Defendant for crimes occurring outside the scope of this Plea Agreement.   Additionally, this Plea Agreement does not preclude the Government from pursuing any civil or administrative matters against Defendant, including, but not limited to, civil tax matters and civil forfeiture which arise from, or are related to, the facts upon which this investigation is based.

23.    <u>Agreement Limited to Southern District of Iowa and the Fraud Section of the Criminal Division of the U.S. Department of Justice</u>.   This Plea Agreement is limited to the United States Attorney's Office for the Southern District of Iowa and the Fraud Section of the Criminal Division of the U.S. Department of Justice, and cannot bind any other federal, state or local prosecuting, administrative, or regulatory authorities.

24.    <u>Victims not a Party to this Agreement</u>.   Defendant understands that no victims are a party to this Plea Agreement, and that the "loss" and "restitution" amounts applicable to this criminal case do not resolve any claims that said persons may have against Defendant.   Defendant understands that all persons and entities, including but not limited to victims, remain free to pursue all lawful civil remedies they may deem appropriate.

25.    <u>Employment Restrictions</u>.   Defendant understands that Defendant will be prohibited by law from any employment with a federally-insured financial institution (insured by either the Federal Deposit Insurance Corporation (FDIC) or the National Credit Union Administration (NCUA) as a result of Defendant's plea of guilty to the subject offense. Defendant will be prohibited by law from participating, in any manner, in the conduct of the affairs of any federally insured-financial institution; Defendant may not continue as or become a director,

11

officer, employee, or controlling stockholder of or agent for a federally-insured financial institution; and Defendant may not participate in any manner in the affairs of any federally insured financial institution, without the written approval of the FDIC and/or the NCUA in accordance with Title 12, United States Code, Sections 1829 and 1785.   Inasmuch as the underlying offense giving rise to this agreement is a violation of Title 18, United States Code, Section 656, the FDIC and the NCUA may not approve an application for a ten-year period beginning with the date of Defendant's plea of guilty.   Defendant understands that the knowing violation of these prohibitions could result in criminal prosecution, with a possible sentence of five years of imprisonment and/or a $1,000,000 fine.

## G.   WAIVER OF TRIAL, APPEAL AND POST-CONVICTION RIGHTS

26.   <u>Trial Rights Explained</u>.  Defendant understands that this guilty plea waives the right to:

(a)   Continue to plead not guilty and require the Government to prove the elements of the crime beyond a reasonable doubt;

(b)   A speedy and public trial by jury, which must unanimously find Defendant guilty before there can be a conviction;

(c)   The assistance of an attorney at all stages of trial and related proceedings, to be paid at Government expense if Defendant cannot afford to hire an attorney;

(d)   Confront and cross-examine adverse witnesses;

(e)   Present evidence and to have witnesses testify on behalf of Defendant, including having the court issue subpoenas to compel witnesses to testify on Defendant's behalf;

(f)   Not testify or have any adverse inferences drawn from the failure to testify (although Defendant also has the right to testify, if Defendant so chooses); and

(g)   If Defendant is convicted, the right to appeal, with the assistance of an

12

attorney, to be paid at Government expense if Defendant cannot afford to hire an attorney.

27.     <u>Waiver of Appeal and Post-Conviction Review</u>.   Defendant knowingly and expressly waives any and all rights to appeal Defendant's conviction in this case, including a waiver of all motions, defenses and objections which Defendant could assert to the charge(s) or to the court's entry of judgment against Defendant; except that both Defendant and the United States preserve the right to appeal any sentence imposed by the Court, to the extent that an appeal is authorized by law.   Also, Defendant knowingly and expressly waives any and all rights to contest Defendant's conviction and sentence in any post-conviction proceedings, including any proceedings under 28 U.S.C. § 2255.   These waivers are full and complete, except that they do not extend to the right to appeal or seek post-conviction relief based on grounds of ineffective assistance of counsel or prosecutorial misconduct.

## H.     VOLUNTARINESS OF PLEA AND OPPORTUNITY TO CONSULT WITH COUNSEL

28.     <u>Voluntariness of Plea</u>.   Defendant represents that Defendant's decision to plead guilty is Defendant's own, voluntary decision, and that the following is true:

(a)     Defendant has had a full opportunity to discuss all the facts and circumstances of this case with Defendant's attorney, and Defendant has a clear understanding of the charges and the consequences of this plea, including the maximum penalties provided by law.

(b)     No one has made any promises or offered any rewards in return for this guilty plea, other than those contained in this written agreement.

(c)     No one has threatened Defendant or Defendant's family to induce this guilty plea.

(d)     Defendant is pleading guilty because in truth and in fact Defendant is guilty and for no other reason.

29.     <u>Consultation with Attorney</u>.   Defendant has discussed this case and this plea with

13

Defendant's attorney and states that the following is true:

    (a)    Defendant states that Defendant is satisfied with the representation provided by Defendant's attorney.

    (b)    Defendant has no complaint about the time or attention Defendant's attorney has devoted to this case nor the advice the attorney has given.

    (c)    Although Defendant's attorney has given Defendant advice on this guilty plea, the decision to plead guilty is Defendant's own decision. Defendant's decision to enter this plea was made after full and careful thought, with the advice of Defendant's attorney, and with a full understanding of Defendant's rights, the facts and circumstances of the case, and the consequences of the plea.

## I. GENERAL PROVISIONS

30. <u>Entire Agreement</u>. This Plea Agreement, and any attachments, is the entire agreement between the parties. Any modifications to this Plea Agreement must be <u>in writing</u> and signed by all parties.

31. <u>Public Interest</u>. The parties state this Plea Agreement is in the public interest and it takes into account the benefit to the public of a prompt and certain disposition of the case and furnishes adequate protection to the public interest and is in keeping with the gravity of the offense and promotes respect for the law.

32. <u>Execution/Effective Date</u>. This Plea Agreement does not become valid and binding until executed by each of the individuals (or their designated representatives) shown below.

## J. SIGNATURES

33. <u>Defendant</u>. I have read all of this Plea Agreement and have discussed it with my attorney. I fully understand the Plea Agreement and accept and agree to it without reservation. I do this voluntarily and of my own free will. No promises have been made to me other than the

promises in this Plea Agreement.   I have not been threatened in any way to get me to enter into this Plea Agreement.   I am satisfied with the services of my attorney with regard to this Plea Agreement and other matters associated with this case.   I am entering into this Plea Agreement and will enter my plea of guilty under this Agreement because I committed the crime to which I am pleading guilty.   I know that I may ask my attorney and the judge any questions about this Plea Agreement, and about the rights that I am giving up, before entering into the plea of guilty.

11/17/2021
Date

MICHAEL BARRY SLATER

15

34.   <u>Defendant's Attorney</u>.   I have read this Plea Agreement and have discussed it in its entirety with my client.   There is no Plea Agreement other than the agreement set forth in this writing.   My client fully understands this Plea Agreement.   I am satisfied my client is capable of entering into this Plea Agreement, and does so voluntarily of Defendant's own free will, with full knowledge of Defendant's legal rights, and without any coercion or compulsion.   I have had full access to the Government's discovery materials, and I believe there is a factual basis for the plea. I concur with my client entering into this Plea Agreement and in entering a plea of guilty pursuant to the Plea Agreement.

_____        _____
Date

Sean Spellman, Esq.
Attorney for Michael Barry Slater
Spellman Law, P.C.
4000 Westown Parkway, Suite 120
West Des Moines, Iowa 50266
Tel: 515-222-4330

35.   <u>United States</u>.   The Government agrees to the terms of this Plea Agreement.

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

RICHARD D. WESTPHAL
United States Attorney
Southern District of Iowa

_____        _____
Siji Moore
Trial Attorney, Fraud Section
Babasijibomi.Moore2@usdoj.gov
1400 New York Ave, N.W.
Washington, D.C. 20005
Tel: 202-834-2793

Adam J. Kerndt
Assistant United States Attorney
Adam.Kerndt@usdoj.gov
U.S. Courthouse Annex
110 East Court Avenue, Suite 286
Des Moines, IA 50309
Tel: (515) 473-9300
Fax: (515) 473-9292

16